UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

| | |
|---|---|
| HARVEY FREDERIC STERLING, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:13-cv-319 |
| ) | |
| v. ) | Honorable Paul L. Maloney |
| ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | **OPINION** |
| Defendant. ) | |
| _____) | |

This is a social security action brought under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security finding that plaintiff was not entitled to disability insurance benefits (DIB). On August 24, 2010, plaintiff filed his application for benefits. He originally alleged a June 29, 1996, onset of disability (Page ID 162), but he later amended his claim to allege a January 1, 2010, onset of disability (Page ID 71, 176). His claim was denied on initial review. (Page ID 94- 103). On September 15, 2011, he received a hearing before an administrative law judge (ALJ), at which he was represented by counsel. (Page ID 62-92). On October 28, 2011, the ALJ issued his decision finding that plaintiff was not disabled. (Page ID 48-57). On January 23, 2013, the Appeals Council denied review (Page ID 35-37), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision. Plaintiff argues that the Commissioner's decision should be overturned on the following grounds:

    1.    The ALJ failed to follow the treating physician rule; and

  2. The ALJ failed to properly evaluate plaintiff's credibility.

(Plf. Brief at 8, 13, docket # 12, Page ID 425, 430). Upon review, Commissioner's decision will be vacated and the matter remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

**Standard of Review**

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would

resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013)("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from January 1, 2010, through the date of the ALJ's decision. (Op. at 3, Page ID 50). Plaintiff had not engaged in substantial gainful activity on or after January 1, 2010. (*Id.*). Plaintiff had the following severe impairments: cervical fusion (post 1996 motor vehicle accident), degenerative disc disease of the spine, obesity, and substance abuse. (*Id.*). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (*Id.*). The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of light work:

> Claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: [h]e can lift up to 20 pounds occasionally and 10 pounds frequently; stand or walk for up to 2 hours and sit for up to 6 hours of an 8 hour workday. He can occasionally climb, balance, stoop, kneel, crouch, crawl; frequently use hand controls bilaterally; occasionally reach overhead bilaterally; frequently handle and feel. He should avoid concentrated exposure to temperature extremes, humidity, wetness, vibration, and hazardous machinery and unprotected heights. He is limited to occupations not requiring complex written communication.

(Op. at 4, Page ID 51). The ALJ found that plaintiff's testimony regarding his subjective limitations was not fully credible:

> The 48-year-old claimant alleges that he has been unable to work since January 1, 2010 due to constant pain primarily in his neck and back, but also in his shoulders, wrist, and left knee. He describes the pain as aching and dull. He reports that his pain is aggravated by bending, climbing stairs, lifting, sitting, walking and standing, and he has associated symptoms of difficulty going to sleep at night and numbness and tingling in the arms and legs. He reported that medication was not helpful.
>
> * * *
>
> At the hearing, Claimant rates his pain at 8/10. However, he displayed no pain behaviors and is not credible. Claimant does have a very good work history. He is currently drawing unemployment, which indicates that he is available to work. Additionally, the record indicates that the claimant's condition has not changed since 1999 yet he was able to continue working until 2010. Indeed, claimant reported that he stopped working because he was laid off.
>
> The objective medical findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. While imaging studies showed significant spinal degenerative changes, no neurogenic corruption was evident. Claimant's neurological functions in terms of motor power, reflex activity and sensation were intact, and his musculoskeletal and extremity reviews were free of clubbing, cyanosis, edema, heat, discoloration, ulceration, diminished pulsation or atrophic changes. Claimant is somewhat obese. The undersigned is aware that obesity often complicates existing medical problems, and the effects of this condition may not be readily apparent. The combined effects of obesity with other impairments may be greater than may be expected without the disorder. I considered any added and accumulative effects of this condition played on his ability to function. In spite of his weight, clinicians observed claimant to ambulate without an assistive device and retain functional range of motion. Claimant has been able to perform self-care tasks and other activities. Claimant prepares light meals, cleans off the table, drives and takes care of family finances. He also takes care of pets, goes for short walks, does gardening and trimming an hour at a time, and goes fishing regularly.

(Op. at 5-8, Page ID 51-56). Plaintiff could not perform any past relevant work. (Op. at 9, Page ID 56). Plaintiff was 46-years-old as of the date of his amended alleged onset of disability and 48-years-old on the date of the ALJ's decision. Thus, at all times relevant to his claim for DIB benefits, plaintiff was classified as a younger individual. (*Id.*). Plaintiff has at least a high school education and is able to communicate in English. He had special education in reading and math. (*Id.*). The ALJ found that the transferability of jobs skills was not material to a determination of disability. (*Id.*). The ALJ then turned to the testimony of a

vocational expert (VE). In response to a hypothetical question regarding a person of plaintiff's age with his RFC, education, and work experience, the VE testified that there were approximately 10,600 jobs in Michigan's Lower Peninsula that the hypothetical person would be capable of performing. (Page ID 86-89). The ALJ found that this constituted a significant number of jobs. Using Rule 202.21 of the Medical-Vocational Guidelines as a framework, the ALJ found that plaintiff was not disabled. (Op. at 9-10, Page ID 56-57).

### 1.

Plaintiff argues that the ALJ violated the treating physician rule. Specifically, he argues that the ALJ should have given more weight to the opinion of Cecile Dadivas, M.D., a treating physician, and given less weight to the opinion of a non-examining medical consultant.[1] (Plf. Brief at 8-13, Page ID 425-30). The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). A treating physician's opinion that a patient is disabled is not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician."). Likewise, "no special significance"[2] is

---

[1] The ALJ's opinion identified the "nonexamining Disability Determination Service (DDS) consultant" as Dennis Beshara, M.D., but the underlying documents indicate that the restrictions mirrored in the ALJ's factual finding regarding plaintiff's RFC were provided by non-examining medical consultant Russell E. Holmes, M.D. (Page ID 100-02).

[2] "We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section." 20 C.F.R. § 404.1527(d)(3).

attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling deference. *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011). "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician. Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'" *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)). A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). An opinion that is based on the claimant's reporting of his symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight, the opinion should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. § 404.1527(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

Plaintiff argues that the ALJ gave too little weight to the opinions of his treating physician, Dr. Dadivas and too much weight to the opinion of a non-examining medical consultant. It is the ALJ's job, not the court's, to weigh the various competing medical opinions. *See Ulman v. Commissioner*, 693 F.3d at 713; *Bass v. Mahon*, 499 F.3d at 509. The fatal flaw in the ALJ's opinion is not in the weight he found was appropriate for the various medical opinions. Most of the opinions upon which plaintiff relies are not medical opinions at all, but rather, opinions on administrative issues such as disability, which are reserved to the Commissioner. The deficiency in the ALJ's opinion is his failure to explain his findings in sufficient detail to satisfy the "good reasons" component of 20 C.F.R. § 404.1527(c)(2).

Plaintiff claimed a January 1, 2010, onset of disability. He last worked as a construction worker in January 2010. (Page ID 74). He testified that he was laid off in January 2010.[3] (*Id.*). Plaintiff presented relatively little medical evidence in support of his claim for DIB benefits, and those records are summarized below.

On May 12, 2010, he appeared at Alliance Health - Spring Arbor, and was treated by Cecile Dadivas, M.D.[4] (Page ID 344). Plaintiff reported an onset of cold symptoms a day earlier. He also reported increased back pain. Plaintiff had injured his back in a "3 wheeler accident in 1996." He related that he had been laid off from his job as a construction worker. (Page ID 344-45). He was requesting an increase in the strength of his Vicodin prescription and to "go on disability." (Page ID 344). Plaintiff's extremities appeared normal. There was no evidence of edema or cyanosis. Dr. Dadivas indicated that she would be ordering a number of objective tests in response to plaintiff's complaints of shoulder, back, and knee pain. (Page ID 346).

---

[3] Plaintiff testified that he continued to received unemployment benefits through the date of his administrative hearing, September 15, 2011. (Page ID 67, 75). He conceded that in his unemployment benefit papers he indicated that he was ready, willing, and able to work. (Page ID 68-69).

[4] Plaintiff had seen Dr. Dadivas in 2009 at Allegiance Family Medicine Spring Arbor and Foote Family Medical Center Spring Arbor. (Page ID 323-40). The ALJ summarized these records as follows: "April-November 2009, progress notes indicate the claimant complained of neck pain yet was working overtime, where he did heavy lifting and climbing up and down ladders. He was taking Vicodin and Motrin for pain. Claimant's diagnoses included obesity, cervicalgia, arthropathy with left leg symptoms. Examination showed the cervical spine was tender to palpation. Lumbar spine showed paravertebral muscle spasm and was positive for tenderness; straight leg raising was negative. Claimant broke his right middle finger in November 2009, which Dr. Dadivas observed was swollen and tender. X-rays confirmed the fracture. It apparently healed well as there are no further records of complaint of finger pain." (Op. at 5, Page ID 52).

On May 12, 2010, x-rays of plaintiff's right shoulder showed no evidence of acute fracture, dislocation, or subluxation. The glenohumeral and acromioclavicular joints were intact. Soft tissues around the shoulder were unremarkable in appearance. X-rays of the left shoulder returned similar results, but did show some "[m]inimal spurring from the left AC joint." (Page ID 303). X-rays of plaintiff's left and right knees showed "minimal degenerative changes." (Page ID 306-07).

On June 22, 2010, plaintiff was seen at Jackson Orthopaedic Care and Surgery by K. Nimir Ikram, D.O. (Page ID 278-79). Plaintiff complained of bilateral knee pain which he characterized as a dull ache. Plaintiff's weight was 240 pounds and his height was 67 inches, resulting in a body mass index (BMI) of 37.5. Plaintiff was diagnosed with mild degenerative joint disease of the knees bilaterally and was treated with a series of injections in June and July 2010. (Page ID 279, 281, 283, 285). On August 24, 2010, Dr. Ikram discussed "arthroscopy versus total knee arthroplasty versus living with the pain." (Page ID 287). Plaintiff responded that he would like to continue to monitor the situation, and would consider surgical intervention if his pain worsened. (*Id.*).

Plaintiff received treatment at Chelsea Back Care provided by Aashish Deshpande, M.D., and Adam Agranoff, M.D. On July 12, 2010, Dr. Deshpande, summarized the results of plaintiff's thoracic and lumbar MRI as follows: "Thoracic MRI did show a T5 old compression fracture and a lumbar MRI showed degenerative disc disease at multiple levels, spondylolisthesis at L5-S1 and anterolisthesis at L5 on S1 at that level, he had diffuse disc bulge as well with some impingement on the L5 nerve root bilaterally, left greater than the right side." Dr. Deshpande indicated that he would be requesting a MRI of plaintiff's cervical spine. He found that plaintiff's strength was 4/5 in his lower extremities. There was no edema and his thigh and calf circumferences were symmetric. Dr. Deshpande recommended that plaintiff participate

in a course of physical therapy and undertake home exercise program involving stretching, strengthening, and range of motion exercises. (Page ID 296-97; *see* Page ID 300-01, 309-12).

On August 23, 2010, Dr. Deshpande noted that plaintiff did not start physical therapy because it was not covered by his insurance. He noted that the MRI of plaintiff's cervical spine showed multilevel disc bulging of a broad based nature centrally at C5-6 and C6-7. There appeared to be at least "moderate neural foraminal stenosis, right greater than the left hand side and moderate central spinal stenosis at 2 levels." (Page ID 292; *see* Page ID 272-73).

On August 26, 2010, plaintiff returned to Dr. Dadivas with his "application for disability." (Page ID 353).

On September 22, 2010, appeared at Chelsea Back Care. Dr. Deshpande noted that plaintiff had received a C-7-T1 epidural steroid injection performed by Dr. Steven Silverman. Dr. Deshpande suggested a "lumbar epidural steroid injection procedure, interlaminar approach at L5-S1." (Page ID 290-91). On October 8, 2010, Dr. Agranoff administered the epidural steroid injection. Plaintiff "tolerated the procedure well, and was brought to the recovery room in good condition." (Page ID 288).

On September 28, 2010, plaintiff complained that he experienced occasional coughing, wheezing, and shortness of breath. He continued to smoke against medical advice. Dr. Dadivas gave plaintiff medication for bronchitis and scheduled a stress test. (Page ID 365-68). On October 11, 2010, plaintiff reported that he went for his stress test and fainted while he was on the treadmill. Dr. Dadivas modified the medication being used to treat plaintiff's bronchitis. (Page ID 372-74).

On October 30, 2010, Dennis Beshara, M.D., reviewed plaintiff's records and found that no medically determinable mental impairments had been established. (Page ID 98-99).

On November 18, 2010, Walid Nader, M.D., performed a consultative examination. (Page ID 375-80). Plaintiff continued to smoke one-half pack of cigarettes per day. (Page ID 375). His lungs were clear to auscultation bilaterally. He was able to get on and off the examination table. He refused to squat or walk on his heels or toes, stating that it was too painful to do so. His extremities had no clubbing, cyanosis, or edema. He had no neurological focal deficits. Plaintiff's grip strength was 50 pounds on the right and 40 pounds on the left. (Page ID 378). Dr. Nader offered a diagnosis of chronic pain syndrome, disc disease of the cervical and lumbar spine, spinal fusion of the cervical spine, left wrist fracture, status post surgery, chronic knee pain, hypertension, hypercholesterolemia, and depression. (Page ID 376).

On December 12, 2010, Russell E. Holmes, M.D., reviewed plaintiff's medical records and offered an opinion that plaintiff was capable of performing essentially the same limited range of light work which later appeared in the ALJ's factual finding regarding plaintiff's RFC. (Page ID 100-02).

On March 31, 2011, plaintiff returned to Dr. Dadivas. (Page ID 393). Dr. Dadivas planned to provide plaintiff with a prescription for hydrocodone and she indicated that she would be ordering a urine drug screen. She noted: "He is applying for disability as he cannot go back to his previous employment and do manual labor in the construction industry again." (Page ID 396). She stated that she "filled out his disability papers" and offered an opinion that plaintiff's degenerative disc disease of the thoracic and lumbar spine "prevent[ed] him from [being] gainfully employed." (Page ID 396).

On April 1, 2011, Dr. Dadivas completed a "Multiple Impairment Questionnaire" for plaintiff's attorney. (Page ID 381-38). She indicated that her diagnosis of plaintiff's condition was degenerative disc disease of the cervical, thoracic and lumbar spine, cervical radiculopathy, arthralgia of the left lower leg and knee, and old compression fracture of L5-S1, grade I listhesis and foraminal stenosis. (Page ID 381). She

indicated that plaintiff had weakened hand grip bilaterally and a limited range of motion in his neck and lumbar spine. She offered an opinion that plaintiff would "no longer be able to perform manual skilled labor as in his previous employment [as a construction worker]." (Page ID 381). She offered an opinion that plaintiff could sit for 2 hours in an 8-hour workday and "stand/walk" for 2 hours in an 8-hour workday. She indicated that plaintiff could occasionally lift and carry 20 pounds. (Page ID 383-84). She stated that plaintiff had moderate limitations in using his arms for reaching (including overhead), but he had no limitations in using his hands and fingers for fine manipulation. (Page ID 385). She asserted that plaintiff could "never" push, pull, kneel, bend, or stoop. (Page ID 387). In addition, she added work-preclusive restrictions such as an inability to perform a full time competitive job on a sustained basis, a need to take unscheduled breaks at unpredictable intervals, and an estimate that plaintiff would likely be absent from work more than three times a month. (Page ID 387). The last question on the questionnaire form was: "In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?" Dr. Dadivas's response was "1999," for a claimant who had stopped working in January 2010, when he was laid off. (Page ID 387).

When the ALJ questioned plaintiff's attorney regarding why Dr. Dadivas would assert that plaintiff had the aforementioned restrictions since 1999, but worked until January 2010, the attorney could only guess that Dr. Dadivas did not understand the question. (Page ID 91).

On April 3, 2011, plaintiff's urine screen test result was positive for use of cannabinoids. (Page ID 392). On September 15, 2011, plaintiff gave testimony that it had been three years since his last use of marijuana. The ALJ found that plaintiff's testimony regarding his drug use was extremely difficult to reconcile with plaintiff's then recent positive urine test:

Q … Let's see if I have any other questions based on your medical records. Do you smoke marijuana?

A I have when I was younger but no, not right now.

Q When was the last time you smoked marijuana?

A About three years ago.

Q So when you were younger, you mean when you are 45.

A Well, you said the last time I smoked marijuana that was the last time I smoked marijuana.

Q Okay, there's a report that I just read from your, your lawyer sent in records just th[is] morning the ones that I was talking about indicated in March of 2011 you were positive for marijuana. Did you smoke marijuana in March of 2011?

A Yeah, I might have.

Q Why did you just tell me that the last time you smoked it was three years ago[?]

A I forget about that.

Q One of the things that I have to judge is credibility, all right and when someone tells me one thing and then they tell me another thing I have to ask myself why are they doing that. Do you have any explanation why you would tell me you last smoked marijuana three years ago and then --

A Like I said --

Q -- why you're positive?

A -- I forgot about.

Q Are there other times you've forgotten about it?

A Not that I know of.

Q So when was the last time your smoked marijuana?

A I really don't know. It's been a while.

(Page ID 79-80).

It was against this backdrop that the ALJ dispatched Dr. Dadivas's RFC questionnaire responses in two sentences, and he generally adopted the non-examining medical consultant's opinions in a third sentence:

> As for the opinion evidence, I give some weight to the April 2011 medical sources statement of Dr. Dadivas who found that the claimant had light lifting restrictions and could not do the heavy construction work anymore because of his condition (Exhibit 9F/19). However, Dr. Dadivas' opinion that the claimant's significant limitations began in 1999 is not credible because the claimant continued working a heavy construction job until he was laid off in January 2010.
>
> The residual functional capacity is supported by a preponderance of the evidence, and is essentially consistent with the Administrative findings of fact made by nonexamining Disability Determination Service (DDS) consultant, Dennis Beshara, M.D., on h[is] review of evidence available at the earlier level determination.

(Op. at 8-9, Page ID 55-56). The ALJ's analysis is insufficient to satisfy plaintiff's procedural right to good reasons for rejecting the work preclusive restrictions suggested by plaintiff's treating physician. *See Smith v. Commissioner*, 482 F.3d at 875-76. Further, the ALJ simply stated that he was generally adopting the RFC suggested by Dr. Beshara,[5] but did not provide an adequate explanation why the opinions expressed by a non-examining physician were more persuasive than the treating physician's opinions. "To be sure, a properly balanced analysis might allow the Commissioner to ultimately defer more to the opinions of consultative doctors than those of treating physicians." *Gayheart v. Commissioner*, 710 F.3d at 379. However, the ALJ's opinion lacks the type of focused analysis of the treating physician's opinions necessary to survive scrutiny under the "good reasons" regulations as currently applied by the Sixth Circuit.

---

[5]Defendant concedes that the ALJ "mistakenly wrote the wrong doctor's name in the decision." (Def. Brief at 12, Page ID 446). Defendant is correct that the record is sufficiently clear that there is no confusion. The ALJ was relying on Dr. Holmes's opinion.

*Id.* The ALJ's decision will be reversed because he failed to provide "good reasons" for the weight he gave to the opinions of plaintiff's treating physician.

**2.**

Plaintiff argues that the ALJ failed to properly evaluate his credibility. (Plf. Brief at 13-16, Page ID 430-33). Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The court does not make its own credibility determinations. *See Walters v. Commissioner*, 127 F.3d at 528. The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard. This is a "highly deferential standard of review." *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005); *see Ritchie v. Commissioner*, 540 F. App'x 508, 511 (6th Cir. 2013) ("We have held that an administrative law judge's credibility findings are 'virtually unchallengeable.'"). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *Buxton v. Halter*, 246 F.3d at 773; *accord White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993).

The Sixth Circuit recognizes that meaningful appellate review requires more than a blanket assertion by an ALJ that "the claimant is not believable." *Rogers v. Commissioner*, 486 F.3d 234, 248 (6th Cir. 2007). The *Rogers* court observed that Social Security Ruling 96-7p requires that the ALJ explain his credibility determination and that the explanation "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248. The court finds that the ALJ gave an adequate explanation and that his factual finding regarding plaintiff's credibility is supported by more than substantial evidence.

### 3.

Plaintiff asks the court to order the Commissioner to award DIB benefits. (Plf. Brief 16, Page ID 433). "[T]he court can reverse the [Commissioner's] decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *See Faucher v. Secretary of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). "A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Id.*; *see Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985); *see also Kalmbach v. Commissioner*, 409 F. App'x 852, 865 (6th Cir. 2011). Here, the Commissioner's decision is being vacated because the ALJ did not comply with the procedural requirement of providing "good reasons" for the weight given to the opinions of plaintiff's treating physician, not because the record strongly establishes plaintiff's entitlement to benefits.

## **Conclusion**

      For the reasons set forth herein, the Commissioner's decision will be vacated and the matter remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

Dated:  March 24, 2015            /s/ Paul L. Maloney  
                                                         Paul L. Maloney  
                                                         Chief United States District Judge